Calla Callas, doing business as Callahan's versus Illinois Liquor Control Commission 514-8358. Okay, Mr. Sanders. Thank you. You know, my name is Alfred Sanders. I represent Calla Callas LLC. The case before us basically involves a challenge to two guilty findings by the Illinois Liquor Control Commission against my client. One for violation of happy hour law and one for violation of undersale to a minor. First, I want to address the happy hour violation. And it's important we understand the three elements of that statute. It's very short and sweet. No retail licensee or employee or agent of such licensee shall serve two or more drinks of alcoholic liquor at one time to one person for consumption by that one person. So it has to be a sale, a multiple sale to an individual, multiple consumption by an individual. But it has to be the same individual. And that is what is crucial in this case with regard to that particular charge. Officer O'Dell testified on behalf of the LLC. He said that he saw people buying multiple drinks. That in and of itself is not illegal. If I go up to the bar and I buy two beers and I come back and I give one to my wife, they call that a handoff. It's not bought for the purpose. It's called a handoff. And it's not bought for the purpose of consumption just by me. And Officer O'Dell actually testified that he witnessed this happening in the bar, the handoffs. So there was no violation simply by them purchasing multiple drinks. In addition, consuming multiple drinks is not in and of itself a violation. The law permits, believe it or not, two people to buy a bucket of beers, which is six beers. So two people can buy six, but one person can't buy two. Now, I'd love to have some time in front of the legislature to talk about the wisdom of that, but it's not what we're here to discuss. What is the law? Where is the picture fit in? The picture is considered a multiple drink just like a bucket of beers is. So if two people buy a pitcher, it's okay. It doesn't matter that there's, what, five or six mugs of beer in there. So each one's buying really more than one at a time. I thought they said there's like 40 ounces in a pitcher. Is that what they said in there? How many ounces in a pitcher? There's no good definition for it, to be honest. I mean, we've had some people. Yeah, some of them cheat, you know. I've had some clients talk about this. Don't tell us until you learn how to walk. My question is this only. Do two people's hands have to be holding on to the handle? That's always been a question I had, too. The law is pretty strict. Can only one person hold on to the handle, and that's a violation, or two? It's not a violation. As long as you're still at the table to sleep, it doesn't matter if it's just one. That's one person holding it. That was part of the argument I think I made in my brief. That would be silly looking for two people trying to carry a pitcher of beer. Yes, I stole your argument. Sorry? I stole your argument. O'Dell never testified. He never put the two together. He never said that the people he saw buying multiple drinks were, in fact, the same ones consuming multiple drinks. That's kind of crucial. It's an absolutely necessary element. The state seems to suggest the ILC is entitled to infer that. Well, I mean, to me, that's like saying we're going to put somebody on murder, John Doe's on trial for murder, and we realize that only Bill Smith had opportunity, but because Bill Smith had opportunity, we're going to convict John Doe. You have to be able to put it all together with one individual, and he never did that. And even by inference, this ILCC in its final order never did that. All they recognized in their findings was that there was testimony of multiple purchases and testimony of multiple consumption, but nowhere in their findings did they say that this was the same person, and that's absolutely necessary under the statute to get a conviction. So why? Mr. Sanders, the request for materials that you issued during the discovery phase, was it broad enough to get the videotape that they withheld? Your Honor, we did not send out the discovery. That's what is amazing about their order, is they claim what was and was not asked for in discovery, it wasn't. We were given some paperwork in the very beginning regarding the underage sale. It said that they had been charged with selling two beers for a dollar apiece, and when we got to trial, the agent's story has totally changed. That now instead of selling two beers for a dollar apiece, they sold one beer for $2.50. And so we submitted with our petition for rehearing an affidavit with the advertisement showing the correct amount was a dollar a beer. We did not present that at hearing because what they testified to was completely contrary to the paperwork they had given us. So we kind of got blindsided at trial with completely different testimony. But the officer said, well, the paperwork I filled out, it was my error. But what we showed with the petition for rehearing is it was not an error. The actual price that he put on his citation on scene was in fact the correct price of beer that day. And in the paperwork you were given, did the officers ever mention that they had confiscated a videotape? They didn't confiscate it. When we had discussions, and this is where this is not in the record, when they told me about the tape, I thought they were asking for our security tape. And our security, they had remodeled the business, and when they did it, they did not put some new cameras in, so we didn't have any. And they were asking for our tape. Nowhere in the process did they ever tell us that they had tried to tape it themselves. And in fact, I asked Officer Gravino on the stand, were they completely dependent on these two undercover kids for their testimony? Why didn't, once they had beer, ask them to pick up a cell phone, call an officer to come in the bar and witness them with the alcohol? And his response was, we don't want to blow their cover. He never volunteered that they had tried to tape it. We did not know that there was a video until we got back to Carbondale the next morning and found out from the former state's attorney, Mike Wetzik, that he had had a hearing on the bartender in Jackson County the same time we were having a hearing in Springfield. That's when we found out about the video. And he said he had found out about it and asked for it, and they couldn't produce it. And that's why we filed a petition for re-hearing on the same basis. The IOCC made no real findings of fact in their initial order. It wasn't until we filed a petition for re-hearing that they came back with all these findings of fact. And where they got these facts, I have no idea, because we gave them a copy of a charge against the bartender in Jackson County. By the dismissal order, it was clearly an O.V. case, which is tort case violation. It was not a C.F. or a C.M. criminal case. But yet in their findings, they said that the case, the Supreme Court case of Clavis that we submitted, was not applicable because she had been tried under a standard of beyond a reasonable doubt, under a criminal statute. It was not criminal. They don't charge them a criminal in those orms violations. So their standard that they were dismissing on in Jackson County was the exact same standard used by the IOCC. And we feel like that same standard, any case law that applies in one should apply to the other. So I don't know where they got the idea that that was a criminal charge. They were given evidence to show that it wasn't and that what the burden of proof was in those orms violations. They seemed to know what discovery was done or thought they knew what discovery was done. How does the trial fact know that? That's a big between the lawyers. I don't file discovery with the court unless I produce it as evidence at the trial. And I realize this is an administrative body that we're dealing with, and I do understand that generally appellate courts do not review the credibility of witnesses. But in a general sense, most of the cases you hear involves the police who are independent going out investigating a possible crime. That evidence is turned over to a state attorney who is independent and decides whether to prosecute. Then that is held in front of a judge who is completely independent of the other two and may be decided by a jury. So you've got different people working together. But in the case of administrative complaints, the IOCC is investigator, judge, jury, and executioner, because those agents work for that commission. The attorney, the prosecutor, works for the commission, and the commission has decided the case. In this particular case, the state did not put up one single independent witness. Every single witness was there in place for people working for them. And yet they decided at the end of the day when there was all kinds of holes in the testimony, and I mean every single one of them had major holes in their testimony, that magically all their people are credible and all of our people are not credible, even though there wasn't a single hole in any of the testimony of my witnesses. And it made sense because when you looked at Mr. O'Dell's testimony, he saw 25 people walking around with pitchers of beer drinking from them. I mean, it was really a vision of a drug fest. And I leaned over to my client and I said, when did you all start selling pitchers of beer? He said, we didn't. They've never sold pitchers of beer in this place. And their testimony was the only pitchers we have are three pitchers behind the bar that you put the soda guns in. They don't even sell pitchers. He testified there were people walking into the other part of the bar, and this was on a day they have a special function called polar bear. One part of the bar you get to go into for free. The other part is a cover charge. The doors in between them were shut, and you were not allowed to pass through unless you went outside and went in and paid the cover charge. The other part of the bar where he said he saw them drinking pitchers of beer, not only did they not have pitchers, they didn't even have any taps. You can't even get a glass of beer in this side of the bar. The only thing they sell is mixed drinks and bottles of beer. It was some of the most fantastic testimony, and that's why I think you see at the end of the hearing, the commission actually asked the attorneys to take a break, go out and see if we could find a way to resolve this. Because they knew at the end of the day, they had to declare somebody to be a liar and somebody to be telling the truth. They had to pick, because the testimony was absolutely on the opposite ends of the spectrum. Twenty years of practicing law, I've never seen anything like this before. But our concern was that after the evidence was presented and they're debating what to do, two of the commissioners said, we hate that polar bear. We hate that event. You need to get rid of that. We've had problems with Carbondale. I find this the one that sponsors polar bear. It's another bar. So the fact that the IOCC wants to see an event go away, that's one thing. But to actually say that on the record seems to suggest that they've got a predisposition to make an example out of something and whether there's any evidence to support the charges or not. And it was actually kind of a scary hearing, to be honest with you, because it turned out to be what Chief Commissioner Schnorf called it at one point during the hearing, a circus. And he actually used that word with regard to their hearing. Officer DeFano's testimony on the underage charge, he tried to take blame for the discrepancy between his report and the testimony on the stand. He said that his report on the scene must have been an error. That had to do with two beers and a dollar apiece. But he must have made the same error when he went in the bar because he said that he told the bartender that she had sold beers to them. Plural. Two guys. That went right down the line with what he put in that report, but it was completely different from what they testified to on the stand. The $2.50 they testified on the stand, his report said a dollar, and the affidavit and advertisement we submitted with the petition clearly showed it was a dollar. So it appeared that what these boys told this officer on the scene was a completely different story from what they told on the witness stand. One of the things that was very disturbing to me was the fact that when I asked Officer DeFano about excess police activity that day, he acted like, no, it's nothing unusual. It's no big deal. Polar bears are a massive deal in the department. It always is. But when the commissioner decided to question him about it, and he said it looks like there was some pretty major police activity that day, he said, yes, there was. So when I ask him a question, the answer is one thing. The same question gets asked by his boss. It's a different answer. He's stabbed when he first went in the bar and talked to the bartender. And, in fact, you've got to understand the sequence of events. Supposedly they sent the agents in. They supposedly bought the alcohol. They came out, told the ILCC officer they bought the alcohol. ILCC called Carbondale, who then has to drive over to the bar, and then they all go in together to find the bartender. Rufino says the evidence was still sitting on the bar. He couldn't even find the right bartender. He picked out the wrong bartender. So if he can't find the right bartender, how does he know that beer sitting over there on that far bar is the same evidence? In supposedly a crowded bar, 20, 25 minutes later, after Carbondale arrives on the scene, it was really some bizarre testimony. But then he said that the bartender told him, and she said the same thing, that she had served six people that morning because she'd only been on duty for 30 minutes. And there was, by the testimony of the agents, 20 to 25 people in the bar and eight bartenders. That's three patrons per bartender. And in 30 minutes, one would have an inclination to let you have Alzheimer's or something to probably remember who you served. I understand there was two bars in that bar, two separate units. Two separate bar areas inside. There's actually two establishments. There's three bars. There's one part of this establishment called Callahan's. It has one bar. Then you move into these doors, you get into Callie's. Callie's is a very large area and has two actual bars inside that bar. So there's actually two bars in Callie's and one in Callahan's. And when he went into Callie's, he went to the wrong bar and picked out the wrong girl. But he knew where the beer was. That was kind of bizarre. But both of them testified that she said that she had only served six people that morning, four girls, two guys, and that none of them were African American. Even he said that she said none of them were African American. Now, he testified that they went to great lengths to protect the identity of these agents and actually said that after the agents left the bar, she never saw them. So how did she know they were African American? That was really an interesting question because they weren't. They were two of them. Both of the gentlemen were black. So how did she know this before she ever exited the bar? If they had really hidden their identity. So his stories, they were just all over the board. The gentlemen themselves, not only was all these people working for the IOCC, the boys that they used to do this, they're always students in the criminal justice department at SIU. Well, you don't make a name for yourself going into San Diego. I think everybody's following the law. You make a name for yourself by busting people. In fact, over my 59 years, I only remember one TV show even maybe being written about a police officer that didn't normally bust people, and that was Andy Griffith. So there's a certain romanticism about catching lawbreakers. And these kids know if we're going to go somewhere, if we're going to get a job later, we need to go in and get busted. Now, it's sad to think that they may be just making the stories up, but that appears to be what happened here because what they told the officer on the scene and what they told in the courtroom, two totally different things. The IOCC is over here busting establishments in this state without making the proper findings as to all the elements. They're putting their own people on the stand. They're not putting their not—I mean, when you get down to Odell, I objected when he started talking about these people said it was their beer. Well, if it's their beer, they're breaking the law, too. Why did he bust them? Well, I worked in that courtroom to testify. He never could identify the names of any of these people. He couldn't tell you exactly who they were, what they looked like, anything. He just had a bunch of them. And yet my client is going to get busted for this. Now, the happy hour thing, I think that's clear. But that fine's not that big. This other one is serious because they're wanting to close this bar down. The state's wanting to close them down for two weeks, and they want them to make it at the worst time of the year right when the students come in. So they not only picked a heavy penalty on top of, I think, a $1,000 fine or something like that, but they want them to shut down at the most crucial time of the year for that bar. So they're serious about what they're trying to do, and their feet need to be held to the fire and they need to dot the I's and cross the T's if they're going to be doing that, not simply inferring this might be the case. If Odell hung around, certainly he'd witness this happening because if we're going to allow the state to start doing that, where does it end? I mean, we might as well just forget about burden proof, forget about elements. Let's save the taxpayers some money from having cops investigate stuff. Let's save the taxpayer money from having hearings, and let's save the businesses the money of paying people like me to go defend them and just go ahead and jump right to the inference that if the state writes you a ticket, you're automatically guilty because that's exactly what they're doing here. And it needs to stop. Whether they dislike polar bear or not, they need to follow the law before they start beating our businesses over the head. Thank you. Thank you. Well, you might want to pronounce your name for us. Yes, it's a little challenging. May it please the court, my name is Frank Bieszczak, and I represent the Illinois Liquor Control Commission. This appeal arises from two orders of the commission, finding that a plaintiff violated two separate provisions of the Liquor Control Act. The commission's decisions should be affirmed because the commission's determination that plaintiffs sold more than one alcoholic drink to one person for consumption by that one person was neither clearly erroneous nor against the manifest way to the evidence, and two, the commission's finding the fact that a bartender at a plaintiff's establishment sold a beer to Jordan Pratt, who was underage, was not against the manifest way to the evidence. With regard to the first violation, the commission's determination that more than one drink was sold to one person for consumption by that one person was not clearly erroneous because it was supported by the testimony of Agent O'Dell. Specifically, Agent O'Dell testified that it was immediately apparent when he entered the establishment that numerous people were drinking directly out of their own pitchers of beer, that he observed bartenders serving multiple drinks, including pitchers of beer, to individual people, and that at least 25 people were drinking directly from their own pitchers of beer, and many other people were holding two drinks at a time. Now, was there any evidence that they didn't sell pitchers of beer? There was some testimony provided by plaintiff's witnesses, and as plaintiff's counsel and, I believe, even the commissioners pointed out. Did anybody say they saw him sell a pitcher of beer? Agent O'Dell did. Who's he? Agent O'Dell. Who's Agent O'Dell? He was the commission agent who entered the premises on that afternoon and wrote the initial violation that was then taken to the hearing and upon which the commission ultimately determined that a violation had occurred. He testified that bartenders were serving multiple drinks. Okay. Now, did he also say that that bar had a tap in order to fill these pitchers? He did not specifically say that there was a tap, but he said that the bartenders were serving pitchers of beer, so presumably there must have been a tap. He saw them tap to get the beer out of the tap. Well, he testified that he saw the bartenders serving pitchers of beer. He didn't specifically state that he saw the beer coming out of a tap. I don't believe he was ever asked to do that. The record allegedly, somebody in the record says they don't have a tap. Right. The record will see that. Yes, there's a conflict in testimony between Agent O'Dell and plaintiff's witnesses. And really, with regard to this violation and the other one as well, this is really, both of them came down to credibility determinations. With regard to this first violation, Agent O'Dell testified to one set of facts and plaintiff's witnesses testified to another, and the commission was required to make a credibility determination as to which witnesses were more credible because there's really no way everybody's testimony could have jived together. Have you seen the video? I have not seen the video, and I cannot say whether one exists. Would the video show a tap, if there was a tap? If there was a video, presumably, I guess it would show a tap if there was a tap at that specific bar. I mean, there were multiple bars in the two different areas. Well, it certainly would show pitchers. Right. And if there's no pitchers in the video, that would clearly make the commission wrong. Well, not necessarily because those were two separate violations that occurred at two separate periods of time. With regard to the underage purchase, there were two underage participants who entered the premises, and their testimony is practically identical with regard to the sequence of events that occurred. And Pratt, the underage person, ordered a bottle of beer, which the bartender then retrieved from a cooler and sold to him. So it's not entirely clear that that happened. Well, I have one question I don't understand. If there's two bars, and allegedly you say the door was open or a swinging door, not locked. Right, between the two areas. So if they bought the draft beer in one and walked into the other, would the one with the other, where they ended up, would they be guilty of the happy hour violation? Because does it require that they sell a beer, a multiple beer, to one person? Yes. Okay, so then that would mean the one on the other side might have been. If the tap was on the other side, they would have been the one that should have been charged, not the one on the side where they ended up. Well, it's all plaintiff's establishment. There are just two separate areas within that establishment. Oh, it's one company. Yeah. Okay. And it's just connected by a doorway that Agent O'Dell testified. Now, one said it was locked in the testimony, and one said it was not. Well, Agent O'Dell testified that he observed people passing through that doorway and that he himself passed through that doorway. And when he initially testified, he used the word open. But then subsequently he clarified that testimony when he said that the door was actually closed but unlocked. But people often refer to unlocked doors as open doors. And to the extent that any confusion was created by Agent O'Dell's testimony, that was a matter for the commission to resolve as the trier of fact. It seemed that a lot of confusion was created by his testimony. It seemed that he actually changed his testimony from his written report to his testimony at the commission hearing. Would you agree with that, that there were discrepancies? I don't believe there were any real discrepancies, Your Honor. His testimony was consistent that pictures of- A locked door that swings open and closed. I think that's one way you can describe an open and a locked door. So you think they're the same? Yes. I think they're essentially the same. But the cost of the beer. The cost of the beer, that was- That wasn't O'Dell? That was not Agent O'Dell. That was the other violation. That was with the two underage participants in Agent Rufino. I'm interested in the fact that you now say if there was a video. I can't say for certain. It certainly seems like there was. Is it a video or not a video? It seems like there was, but I don't know personally 100%, so I don't want to say. I don't completely know. Well, who had it? Presumably, if one existed, it would have been the commission. The commission would have had it. Well, somebody in the bar would have been taking it. Well, the alleged video would have been- The video issue with people with eclatus, I assume that's the video we're talking about. Yes. Allegedly, that video would have been worn by one of the underage participants, and therefore then it would have been within the possession of the commission. Collected by an agent? Yes, presumably so. Did you ever find out which agent collected it? I don't know what the fate of the video was. I can't say for certain. But in any event, even if there was a video, people with eclatus does not provide a basis upon which to reverse the commission's decision in this case because people with eclatus was a very specific decision that operated within a very specific context. The issue in that case was the scope of discoverable materials in misdemeanor DUI cases, and specifically whether or not the state commits a discovery violation when it fails to properly preserve a squad car video of a DUI stop after a request for discovery has been made. In reaching this decision, the court specifically analyzed the development of the case law and the statutory law regarding squad car videos and with regard to DUIs and how this was an outgrowth from requirements to produce evidence in criminal cases. And so this was very limited to a misdemeanor DUI case. And in this case, it's a very different context for two main reasons. One, this is an administrative proceeding rather than a misdemeanor DUI. And also, no discovery request was ever made. In that case, the court found that a discovery violation occurred because the state failed to preserve evidence after a request had been made. Here, no request had been made. So you don't think there's a duty on the state if no request is made to preserve something that could exculpate the parties? Well, if such evidence were not to be produced for whatever reason, it would not provide a basis for reversal under people who play this because that's just a separate proceeding altogether. And it was an outgrowth of dealing within a criminal law scenario. This is a quasi-civil proceeding, though, isn't it? Yes, it's an administrative proceeding. Are you telling this court that we have no ability to sanction? No, I'm not saying that at all. Okay, so you recognize that for a failure to deliver the video, this court at least could sanction the commission? Absolutely. It's certainly possible. But again, here we don't have any discovery request for the video, which is a key distinguishing factor for people who play this, where that evidence was requested and it was thereafter destroyed. How did it come up about the video? How do we even know about it if there's no request for it? Well, in the petition for a hearing, plaintiff included the dismissal of the claim that was brought directly against the bartender by the city of Carbondale. And there was reference to a video in that proceeding, and the charge was ultimately dismissed. And that's really all that's in the record about the video. So as I understand it, the agency gave the liquor establishment's counsel reports. Mm-hmm. Instead of there being a formal request, they just went ahead and volunteered the reports, right? That's my understanding. So why would the counsel for the defendant ask for anything more if he believes that your client has been honest and forthright? Well, he could have requested additional evidence. I mean, certainly the attorney in this other proceeding that was brought by the city of Carbondale learned of the video. That's a criminal. That's true. That's a cross-site criminal. That's an ordinance violation where there's discovery and the state's attorney's involved or a city attorney is involved. It's a little different than this type of proceeding, isn't it? Yes, exactly, Your Honor. It is different, and that's why the standards are different in this case. With regard to whether the evidence presented at the hearing established a violation of the act insofar as plaintiff served more than one alcoholic drink to one person for consumption by that one person, plaintiff has brought up the burden of proof. And this was a hearing that was conducted pursuant to the Administrative Procedure Act. Therefore, the burden of proof was by a preponderance of the evidence. And so if the evidence proved it was more likely than not that plaintiff sold more than one drink to one person for consumption by that one person, then a violation has been established. You mean there's a presumption that if it's more than so many ounces, it's probably for two people or three? No, the presumption here is that because there was such a widespread practice of this going on, there were at least two. What's going on? Multiple drinks being served to individual people, and then those individual people drinking. Now, the multiple drinks in your definition is pitcher. Pitcher or more drinks at once. Agent O'Dell testifies. Well, let's stay with a pitcher. Okay. But there's no evidence of anybody drinking out of a pitcher? There's evidence of at least 25 people drinking. 25 people are walking around drinking out of pitchers? Yes. That's what Agent O'Dell says. Or are they sitting down? He doesn't specify whether they're standing or sitting, but it's the polar day weekend. Was there any evidence of how many seats there were in this place? No, there was not, Your Honor. And are most people standing here? Are most people sitting? That was not evidence either? It was not clear. Presumably by that point of the day it was probably fairly crowded because this was a big event. But you got about 25 people drinking out of pitchers. Yes, that's what Agent O'Dell observed. And based on that large number of people. Did he testify to that? Yes. Saw 25 people drinking out of pitchers? He estimated that it was at least 25 people. And they were all drinking out of pitchers? Yes, Your Honor. Presumably at an event like this people, I guess, order their own pitchers so they don't have to keep going back up because maybe it's crowded. I don't know the exact reason. But that was his testimony. And based on this happening on such a large scale, the commission reasonably concluded that a violation occurred in this case. This is not a situation where, say, one person, Agent O'Dell witnessed one person go up to the bar and get a pitcher and then sit down and start to drink out of it. Here you have at least 25 people. But he didn't name any of them or never? He didn't provide any specific names, Your Honor, no. No descriptions? Not of the individual people, no. But he consistently testified about the practice that was ongoing and the scope to which it was happening with such a large number of people. What kind of cups? Did they have cups or something else at the tables? No, he testified that there were no cups. He testified it was immediately apparent that they were drinking directly from the pitchers and were not using cups. And, therefore, that sort of forms the basis of the violation. And with regard to the underage sale, the commission is finding a fact that a bartender at one of its establishments sold the beer to crappings underage. I have a question there. I'm a little confused. Two went in and got wristbands. Yes, they were stamped. Oh, stamped, I'm sorry. Yes. But they only asked for one beer? Yes, the one just pressed stood at the bar and ordered a beer. See, I thought somebody went back outside and said, it's $2.50, I need more money or something like that. Oh, no. Initially, before, when they first attempted to enter the establishment, there was a cover charge. $5 apiece? What was that? It was a cover charge of like $5 apiece. Yes. And so they had to go outside and ask Agent Ruffino if it was okay for them to pay the cover charge when they entered. And so then they went back, they entered. They both testified that their driver's licenses were checked, that their hands were stamped. Right. There's a long list of things. But they both testified that the bar was somewhat crowded at the time, that Pratt ordered a Bud Light, and that the bartender received it from the cooler. They both provided identical descriptions of the bartender. Pratt and Ermey both testified that after Pratt paid for the beer, they sat there and talked to each other until the bartender went around, and then they went back outside to Agent Ruffino's vehicle. Okay, he paid for the beer, but he didn't drink it. Correct, because he was underage. Well, I didn't ask that. He paid for the beer. They set it on the bar. He went outside, didn't he go outside, right? After the bartender turned around, Pratt and Ermey went outside to Agent Ruffino's vehicle, yes. Did he ever pick up the beer? No, he did not. There's no evidence that he did. Because there was an argument about fingerprinting the beer bottle. Right. Possibly he might have, you know, when she handed it to him, maybe he had grabbed it or something like that. But he's sitting at the bar. Yes, he was at a stool at the bar. At the far end of the bar. And the other person didn't order a beer. Correct, he was standing behind him the entire time. Was he underage, the other person? Yes, they were both 19. And, in addition, Pratt, Ermey, and Agent Ruffino all testified consistently regarding the sequence of events that occurred prior to the entry into Plaintiff's establishment and then what happened thereafter. And based on this wealth of consistent testimony, the commission reasonably concluded that those witnesses were credible and that their testimony established that a sale had occurred. Okay, I have one question. What color was the stamp? I don't. Was it black? I don't remember if that was in the testimony specifically. I want to say it was red, but I'm not confident that that was in the testimony. But when Pratt ordered the beer, the bartender did not ask to ask about his age or ask to see any identification. Apparently they're checked at the door. Well, right. That's what I'm trying to figure out. Yeah, they're checked at the door because you don't need to be 21 to enter, but you need to be 21 to 5. And so presumably a 21-year-old would have a different stamp or have a wristband or something so the bartender could, you know, immediately figure out whether the person was underage or not. And here Pratt was stamped as underage, and there was no further request about to see if he had any identification or what his age was or anything like that. She simply sold him the beer at that point. And so based on all of that evidence, the commission's finding was not against the manifest way of the evidence. Plaintiff points out a few alleged inconsistencies between the testimony of Agent Ruffino and Pratt and Irvy. Those matters are discussed a little more fully in the brief where I kind of go one by one. In the interest of time, I will just leave that in the brief unless Your Honor has specific questions about any of those matters. But most of those alleged inconsistencies regard things that are collateral to the issue of whether or not the sale actually occurred. And when viewed in light of the wealth of consistent testimony that was provided by Pratt and Irvy and Agent Ruffino, that shows that the commission's finding of fact was not against the manifest way of the evidence. Briefly, the plaintiff talks a number of times about an instance that occurred during the cross-examination of Agent O'Dell regarding a pitcher of beer. What happened there was a plaintiff's counsel proposed a situation where I believe these three people are sharing a pitcher of beer and asked Agent O'Dell's opinion as to whether that factual scenario constituted a violation of the act. But ultimately, Agent O'Dell's opinion as to what violates the act, on the basis of some facts that were not present in this case, is not relevant to whether the commission's ultimate determination that a violation occurred is clearly erroneous or whether Agent O'Dell was a credible witness with regard to the factual matters about which he observed and about which he testified. Based on that testimony, it was then the responsibility of the commission to make a credibility determination and apply those facts to the law and ultimately reach a conclusion as to whether a violation occurred. And it's that decision by the commission which is on review in this appeal. Very briefly, I just want to address the issue of bias. The plaintiff claims that the commission was biased against it. It's important to remember that any claims of bias begin with the presumption that the administrative agency officials are objective and capable of fairly judging the issues and that the burden rests on the party claiming bias, in this case plaintiff, to overcome that presumption and establish that bias occurred. In this case, plaintiff identifies just a few isolated comments which in and of themselves don't indicate bias. And this was after the hearing? No, but there were two main scenarios. One was during the cross-examination with Agent O'Dell. But you can go on. Okay, regarding the pitcher of beer or, excuse me, the bucket of beer and all Chairman Schnorf was doing in that scenario was attempting to restrict the scope of cross-examination to matters that were covered during Agent O'Dell's testimony. Now I'm really confused. You're talking about buckets and they weren't drinking out of the buckets? No, that was a line of questioning that came up during Agent O'Dell's cross-examination. And that's why Chairman Schnorf stepped in, too, is because this issue of buckets wasn't relevant because Agent O'Dell testified about buckets. Exactly. There were or weren't? There was not any testimony about buckets. It was pitchers and people holding multiple drinks. But there's no testimony as to buckets? Correct. Okay. Correct, Your Honor. And when Chairman Schnorf made his comment, he specified it was based on the testimony he's heard thus far. So, therefore, it didn't show that he was prejudging the testimony. And very briefly, if I could, the comments that came after the hearing was completed. They were not related to factual or legal issues that resulted in a finding of a violation by a plaintiff. Rather, it was two commissioners who indicated that they may have been willing to impose a harsher penalty, but merely having a difference of opinion about penalty does not show bias, particularly in this case when that penalty was not imposed. And then with regard to one or two comments that were made about the polar bear event, cases show that, or the law is fairly clear, that just because an agency official takes a strong stance on an issue does not overcome the presumption of objectivity. If this Court has no further questions. Thank you. Thank you. Your Bowl. Thank you, Your Honor. First of all, while the procedures in the administrative hearings versus ordinance violation cases, procedures for conducting discovery may be somewhat different, the standards of evidence are not. Ordinance violation cases, according to Carbondale statute, carry the standard of preponderance of the evidence, which is the same one used by the ILCC in these administrative hearings. With regard to the video, we're speculating down the road that this may have been a cell phone camera stuck in somebody's pocket, one of those two agents. We don't know. We don't know if it was botched. We don't know if it just showed something different from what they claimed it showed and decided to destroy it. We don't know what happened to it. But I can tell you, in 16 years of practicing before the ILCC, I have never once seen them produce a video in a hearing or in evidence or discovery or anything. This was something brand new. We had never seen or heard of before. I have cases with them now, and you can bet that all my discovery requests are very formal, and they do include any requests for any videos they've taken now. So if this is something new they're starting to do, yes, I want to see those videos. What happened to that one, nobody knows. We couldn't find out what happened to that case, so they decided maybe we should dismiss this case and go away. The cover charge goes to the issue of the closed doors because you've got this part of the bar is free to get in, and this part of the bar is $5 to get in. Why would you leave the door open between those two places and let people run in this place free and run through the door and escape the cover charge? So the cover charge that the agent testified to supported the bartender and owner's statements that those doors were shut, closed, and I don't know if they said they were locked, but they were not people passing between them because to do so would have defeated the whole point of them having a cover charge in that part of the bar. The fact that they were drinking from pitchers, that kind of brings up some pretty wild visions, maybe actually of what I would have thought of myself. There's no law against drinking from pitchers. So if two people buy a pitcher and they both decide to drink from it, that's legal. There's nothing wrong with that. I wouldn't say there's nothing wrong with it, there's nothing illegal about it. But that's why I think sometimes this is getting blown out of proportion because of the vision we have of people drinking from pitchers. If two people are drinking from it, then it wasn't for consumption by that one person. The findings by the LLC state, number five, ILCC agent David O'Dell testified about the violation of the happy hour law. He stated that he observed numerous instances on the license premises of single people drinking from pitchers of beer and many patrons having two drinks in their hands. He also observed bartenders serving more than one drink to one person. The ILCC found agent O'Dell to be a credible witness. Nowhere in their findings do they say that the people that had more than one drink in their hand were the ones that had bought more than one drink. They never even connected the dots by inference or anything else in their actual order. So the fact that you've got two people sitting over here drinking by themselves from a pitcher of beer and the fact that you've got somebody over here being served two beers, two bottles of beer at one time, you can't say because this is happening here and this is happening here, there's a violation. It doesn't work that way. It has to be the same person all the way down the line. And he was only there 15 minutes. So in 15 minutes, according to him, he walked through one place, went through these doors, walked in the other bar, looked at all these people, talked to several people, observed what was happening and wrote a ticket and got out of there. That's pretty fast. I don't think he was there long enough to even observe what he needed to observe under the statute. Lastly about the video, I don't pretend to be perfect and I know I've made mistakes in my legal career, but had I remotely had a clue that these officers had tried to take a video, there is no way in the world I would have let three of them testify in that hearing and never even asked them what happened to them. This thing was completely hidden from us and the way this proceeded demonstrates that because I've thought some dumb things before, but I'm never going to let a crucial piece of evidence just, ah, just forget about it. If it's there, I want to know what happened to it because certainly it could exonerate us all. And if they had had a video that showed this actually happening, they would have probably pled guilty and said, let's just avoid a trial. But our people said it didn't happen. They said it didn't and they couldn't prove it. Thank you. Thank you. Okay, this matter will be taken under advisement and this position is shifted to the courts. Thank you.